J-A31014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CURT V. HOYAK AND JOYCE E. WATERSTREET-HOYAK, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| ANTHONY D. DIPPOLITO, | |
| Appellee | No. 1383 EDA 2016 |

Appeal from the Order Entered April 7, 2016
In the Court of Common Pleas of Northampton County
Civil Division at No(s): C-48-CV-2014-6471

| | |
|---|---|
| CURT V. HOYAK AND JOYCE E. WATERSTREET-HOYAK, H/W | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| ANTHONY D. DIPPOLITO, | |
| Appellant | No. 1440 EDA 2016 |

Appeal from the Order Entered April 7, 2016
In the Court of Common Pleas of Northampton County
Civil Division at No(s): C-48-CV-2014-6471

BEFORE: BENDER, P.J.E., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 13, 2017**

---

[*] Former Justice specially assigned to the Superior Court.

Curt V. Hoyak and Joyce E. Waterstreet-Hoyak ("the Hoyaks"), appeal from the April 7, 2016 order, which granted in part and denied in part their motion for post-trial relief. The day after the Hoyaks filed their notice of appeal, Anthony D. Dippolito ("Mr. Dippolito") also filed an appeal from the April 7, 2016 order.  Mr. Dippolito failed to identify his notice of appeal as a cross appeal in accordance with Pa.R.A.P. 903(b).[1]  Thus, his appeal was assigned a separate docket number.  The cases were subsequently consolidated by this Court.[2]  After careful review, we affirm.

This matter stems from an underlying breach of contract and ejectment action brought by the Hoyaks against Mr. Dippolito on August 4, 2014.  Testimony was heard at a non-jury trial on September 15, 2015, after which the trial court issued the following relevant Findings of Facts:

_____

[1] Pennsylvania Rule of Appellate Procedure 903 provides, in relevant part:

> **(b) Cross appeals.**  Except as otherwise prescribed in subdivision (c) of this rule, if a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served, or within the time otherwise prescribed by this rule, whichever period last expires.

Pa.R.A.P. 903(b).  **See also** Pa.R.A.P. 903 note (providing that "[a] party filing a cross appeal pursuant to subdivision (b) should identify it as a cross appeal in the notice of appeal to assure that the prothonotary will process the cross appeal with the initial appeal.").

[2] By *per curiam* order entered on July 11, 2016, this Court granted the parties' joint application for consolidation of appeals at Nos. 1383 EDA 2016 and 1440 EDA 2016.

1. [The Hoyaks] are the owners of real property located at 118 East Greenwich Street, Bethlehem, Northampton County, Pennsylvania ("Property").

2. [The Hoyaks] reside at the Property.

3. The Property contains a parking lot ("Lot") with dimensions of fifty-five feet by sixty-five feet.

4. Since [the Hoyaks] purchased the Property in 1986, the Lot has been subject to a ninety-nine-year lease ("Lease"), with [the Hoyaks] being the landlord.

5. The original tenant under the Lease was C & M Zumas Company.

6. In May 1990, C & M Zumas Company assigned its interest in the Lease to Demetri and Paula Herron.

7. In September 1996, the Herrons assigned their interest in the Lease to [Mr. Dippolito].

8. The Lease provides: "[Mr. Dippolito] hereby agrees to commit no waste; and at the end of said term the leased premises shall be delivered up in as good a condition as at the commencement thereof[,] ordinary wear and tear excepted."

9. Under the terms of the Lease, "any maintenance required to be done to the leased premises in order to keep the same in a neat, safe and sightly manner acceptable to [the Hoyaks] shall be the sole responsibility of [Mr. Dippolito]."

10. Under the Lease terms, [Mr. Dippolito] agreed "to carry public liability and property damage insurance with combined limits of coverage of at least $1,000,000.00 and to name [the Hoyaks] as … additional insureds on said policy or policies."

11. The Lease also provides: "[Mr. Dippolito] shall, upon notice by [the Hoyaks], pay within nineteen (19) days of said notice … thirty-seven percent (37%) of the real estate taxes that are presently charged against the land, exclusive of the building on the Property."

12. Under the Lease terms, [Mr. Dippolito] agreed "not to place or erect or allow to be placed or erected any sign, fence, or other structure upon the demised premises without

- 3 -

the prior written approval of [the Hoyaks], whose decision on the matter shall be final … but whose approval shall not be unreasonably withheld."

13. The Lease prohibits the use of the Lot "as a repository for any motor vehicles, debris, equipment or other personalty."

14. The Lease provides that "no subsequent alteration, amendment, change or addition to the Lease shall be binding upon [the Hoyaks] or [Mr. Dippolito] unless reduced to writing and signed by them."

15. Pursuant to the Lease, a default occurs if [Mr. Dippolito] "violates or fails to perform or otherwise breaks any covenant or agreement … contained" in the Lease and fails to cure any such violation within fifteen days of receiving notice thereof.

16. If a default occurs, the Lease becomes subject to termination.

17. Since [Mr. Dippolito] became the tenant under the Lease, there were at least three occasions when [the Hoyaks] verbally requested that [Mr. Dippolito] provide them with a certificate of insurance, and [he] failed to do so.

18. On November 11, 2013, [the Hoyaks] sent [Mr. Dippolito] a letter ("Notice of Default") informing him that he was in default of the Lease for failing to provide them with proof of insurance, failing to pay his share of the real estate taxes for the Property, and failing to obtain [the Hoyaks'] permission before accepting assignment of the Lease, the last of which is not relevant to this action.

19. The Notice of Default represented the first time that [the Hoyaks] made a written demand to [Mr. Dippolito] for proof of insurance.

20. Accompanying the Notice of Default was a Property Tax Worksheet representing [the Hoyaks'] computation of the total amount of real estate taxes [Mr. Dippolito] was responsible for and had not paid since 2000, broken down year-by-year and totaling $6,098.29.

21. The Notice of Default and accompanying Property Tax Worksheet represented the first demand by [the Hoyaks], of any kind, for [Mr. Dippolito] to pay his portion of the Property's real estate taxes.

22.    Upon receiving the Notice of Default, [Mr. Dippolito] contacted his insurance agent to ensure that the Lot was properly covered by insurance.

23.    On November 18, 2013, [Mr. Dippolito] responded to the Notice of Default by letter, attaching thereto the declaration page of an Ohio Casualty Insurance policy, number BOP1538654, with an effective date of September 30, 2013, covering [Mr. Dippolito] and 1330 Center Street, Bethlehem, Northampton County, Pennsylvania, an office building owned by [Mr. Dippolito] that is adjacent to the Lot.

24.    This documentation was not satisfactory to [the Hoyaks], prompting [Mr. Dippolito] to contact his insurance agent again.

25.    [Mr. Dippolito] then provided [the Hoyaks] with the declaration page to a Liberty Mutual Insurance policy, numbered BOP9879201, with an effective date of December 27, 2013, also covering [Mr. Dippolito] and his office building and, diverging from the Ohio Casualty declaration page, adding property insurance coverage for the Lot, which was inadvertently and incorrectly identified as 135 Hottle Avenue, Bethlehem, Northampton County, Pennsylvania.

26.    When this documentation was also not satisfactory to [the Hoyaks], [Mr. Dippolito] again contacted his insurance agent and provided [the Hoyaks] with more documentation, dated February 14, 2014, this time in the form of an endorsement to the Liberty Mutual policy that enacted two amendments to it, effective December 27, 2013:   1) changing the Lot's address to 118 E. Greenwich Street, Bethlehem, Northampton County, Pennsylvnia; and 2) adding [the Hoyaks] to the policy as additional insureds.

27.    On multiple occasions, [Mr. Dippolito] has, in response to [the Hoyaks'] requests, refused to perform winter maintenance and/or plowing to the Lot following winter weather events, which rendered the Lot, in [the Hoyaks'] opinion, unsafe and required [them], on some of those occasions, to secure winter maintenance to the Lot through alternative means.

28.    For periods of time between 2007 and 2014, [Mr. Dippolito] permitted his stepson to park a utility trailer on the Lot.

29.   When notified by phone of [the Hoyaks'] objection to the trailer's presence on the Lot, [Mr. Dippolito] took no action.

30.   The first written notice from [the Hoyaks] to [Mr. Dippolito] that his failure to remove the utility trailer was a default under the Lease was the complaint filed by [the Hoyaks] in a magisterial district court.

31.   The utility trailer was removed from the Lot approximately in the spring of 2014 and is no longer present on the Lot.

…

37.   On January 8, 2014, [the Hoyaks] provided [Mr. Dippolito] with a Notice to Quit, instructing him to vacate the Lot by January 27, 2014.

Trial Court Decision ("Decision"), 12/16/15, at 1-7 (citations to the record and brackets added by the trial court omitted).

Accompanying the above Findings of Fact, the trial court entered an order dated December 16, 2015, denying the Hoyaks' ejectment claim, but awarding the Hoyaks damages in the amount of $4.00, plus costs for their breach of contract claim. On December 23, 2015, the Hoyaks filed a motion for post-trial relief, requesting the entry of a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. Additionally, on December 28, 2015, the Hoyaks filed a motion for attorney's fees. After the submission of briefs and hearing oral argument on the issues raised in the Hoyaks' motions, the trial court issued an Opinion and Order dated April 7, 2016, by which their motion for post-trial relief was granted in part and denied in part. More specifically, the court awarded the Hoyaks' attorney's fees in the amount of $6,200.00, plus $4.00 in nominal damages, in connection with their breach of contract claim. Judgment was entered in

favor of Mr. Dippolito and against the Hoyaks on their ejectment claim, and the Hoyaks' motion for attorney's fees was denied as moot. ***See*** Trial Court Order, 4/7/16, at 1-2.

On May 5, 2016, the Hoyaks filed a timely notice of appeal, which was immediately followed by Mr. Dippolito's notice of cross appeal. As stated *supra*, the two appeals were consolidated by order of this Court on July 11, 2016. Both parties filed timely, court-ordered concise statements of errors complained of on appeal. Herein, the Hoyaks raise the following issues for our review:

1. Whether the trial court erred in denying [the Hoyaks'] motion for judgment notwithstanding the verdict or a new trial by concluding that [Mr. Dippolito] did not default under the lease agreement by permitting a trailer to be parked thereon and that [the Hoyaks] are therefore not entitled to relief in the nature of ejectment?

2. Whether the trial court erred in denying [the Hoyaks'] motion for judgment notwithstanding the verdict or a new trial by concluding that [Mr. Dippolito] did not default under the lease agreement by failing to plow the parking lot following snowstorms, despite [the Hoyaks'] demand, and that [the Hoyaks] are[,] therefore[,] not entitled to relief in the nature of ejectment?

3. Whether the trial court erred in denying [the Hoyaks'] motion for judgment notwithstanding the verdict or a new trial by concluding that [Mr. Dippolito] did not default under the lease agreement by failing to have insurance on the parking lot and failing to provide [the Hoyaks] with proof of same, despite [] [their] verbal and written demands, and that [the Hoyaks] are therefore not entitled to relief in the nature of ejectment?

4. Whether the trial court erred in denying [the Hoyaks'] motion to modify the court's decision or for a new trial by concluding that [Mr. Dippolito] did not breach the lease agreement and did not default under the lease agreement due to his failure to

pay his share of the real estate taxes following demand by [the Hoyaks]?

Hoyaks' Brief at 7-8.[3]

Additionally, Mr. Dippolito raises the following issues for our review:

1. Did the lower [c]ourt err in finding that the language of the lease as to damages included counsel fees?

2. Did the lower [c]ourt err in failing to consider and compare the amount of damages claimed in [the] Hoyaks' Complaint and the amount actually awarded?

3. Did the lower [c]ourt err in assuming that it was required to award attorney fees to [the] Hoyaks since [the] Hoyaks received a *de minimis* award?

4. Did the lower [c]ourt err in failing to find that [the] Hoyaks' claim was to uphold a significant public purpose before it awarded attorney fees in connection with a nominal award?

5. Is the lower [c]ourt's order for the payment of counsel fees excessive in relation to [the] Hoyaks' award and should it shock the conscience of this Court?

6. Should the [c]ourt's finding that [the] Hoyaks' motivation in filing suit was for the purpose of voiding an onerous lease preclude [the] Hoyaks' recovery of counsel fees?

Mr. Dippolito's Brief at 7.

We first address the Hoyaks' claims that the trial court erred in denying their motion for a JNOV or new trial by concluding that Mr. Dippolito did not default under the terms of the Lease.

When considering a challenge to the trial court's ruling denying a motion [for] new trial or JNOV, we are guided by the following standards of review.

---

[3] Hereinafter, "Hoyaks' Brief" refers to the brief filed on July 29, 2016, by the Hoyaks, as Appellants.

We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

**Gbur v. Golio**, 932 A.2d 203, 206-207 (Pa. Super. 2007) (citations and quotations omitted), quoting **Stalsitz v. Allentown Hosp.**, 814 A.2d 766, 771 (Pa. Super. 2002), *appeal denied,* 578 Pa. 717, 854 A.2d 968 (2004).

When considering a challenge to denial of JNOV,

the standard of review for an order granting or denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. We must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. Furthermore, judgment nov should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. Review of the denial of judgment nov has two parts, one factual and one legal.

Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence…, we will not substitute our judgment for that of the finder of fact.

**Northeast Fence & Iron Works, Inc.**[ **v. Murphy Quigley Co., Inc.**, 933 A.2d 664, ]668 [(Pa. Super. 2007)] (citations omitted).

***Underwood ex rel. Underwood v. Wind***, 954 A.2d 1199, 1206 (Pa. Super. 2008).

In their first three claims, the Hoyaks aver that the trial court erred in finding Mr. Dippolito was not in default under the Lease for: (1) permitting a utility trailer to be parked in the Lot; (2) failing to plow the Lot; and (3) failing to maintain proper insurance on the Lot and to provide the Hoyaks with proof thereof. The Hoyaks suggest that the trial court's findings conflict with the plain language of the Lease, which provides, in relevant part, as follows:

9.00 <u>Remedies of Lessor</u>

If the Lessee:

(a) Does not pay in full when due any and all installments of rent and/or any other charge or payment herein reserved, included or agreed to be treated or collected as rent and/or any other charges, expenses, or costs herein agree to be paid by the Lessee; or

(b) Violates or fails to perform or otherwise breaks any covenant or agreement herein contained; or

(c) Becomes embarrassed [*sic*] or involvent [*sic*], or makes an assignment for the benefit of creditors … or if for any other reason Lessor shall, in good faith, believe the Lessee's ability to comply with the covenants of this lease, including the prompt payment of rent hereunder, is or may become impaired, thereupon this lease and the terms hereby created shall determine and become absolutely void without any right on the part of Lessee to reinstate this lease by payment of any sum due or by other performance of any condition, terms, or covenant broken. However, Lessee shall have fifteen (15) days to cure any default from the day that the default occurs.

Lease, 8/6/86, at 4-5 (attached as Exhibit "A" to the Hoyaks' Complaint).

- 10 -

As the trial court noted in its Decision:

"Contract law and general contract principles govern lease agreements." *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 653 n.4 (Pa. Super. 2014).

One such principle of contract law applicable to this case is sometimes called the doctrine of necessary implication, which has been described as follows:

In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

… Thus, where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it. This is true even where the contract itself is not ambiguous.

*Slater v. Pearle Vision Ctr., Inc.*, 546 A.2d 676, 679 (Pa. Super. 1988) (citation omitted).

Decision at 9-10 (internal citations omitted).

The trial court applied the doctrine of necessary implication to the Lease in the present case as follows:

Here, in order for the parties to effectuate the provision in paragraph 9.00(c) of the Lease that gives [Mr. Dippolito] fifteen days to cure a default, [the Hoyaks] were necessarily required to provide [Mr. Dippolito] with formal notice that he was in default, including the specific reasons why, so that [Mr. Dippolito] could become aware of when the fifteen-day clock began ticking and exactly what measures were required to be taken to avoid forfeiture.[1] [The Hoyaks'] own actions substantiate the [c]ourt's finding that such formal notice was required. (See Ex. P-3 ("Please accept this letter as written notice to you under Section

- 11 -

9.00, *et al*. that you are in default of the Lease.")). Accordingly, the [c]ourt implies such a requirement in paragraph 9.00(c) and determines that [the Hoyaks] complied with the requirement by sending [Mr. Dippolito] the Notice of Default. As a byproduct, the [c]ourt also finds that [Mr. Dippolito] had fifteen days from November 11, 2013, to cure only the specific defaults identified in the Notice of Default and that any other violations of the Lease that were alleged in [the Hoyaks'] Complaint but that were not included in the Notice of Default are irrelevant to the issue of forfeiture.

> [1] This does not mean that the [c]ourt agrees with [Mr. Dippolito's] argument that formal notice of default had to be given in writing. To the contrary, [the Hoyaks] could have verbally notified [Mr. Dippolito] that he was in default and had fifteen days to cure. It *does* mean, however, that formal notice of default was required before a default could actually occur.

Decision at 10-11. With this framework in place, the trial court examined the violations of the Lease which the Hoyaks allege entitle them to possession of the Lot.

First, Mr. Dippolito admitted at trial that he allowed his stepson to temporarily park a utility trailer on the Lot, thereby violating paragraph 3.00 of the Lease. However, the court concluded that the parking of the trailer on the Lot did not warrant forfeiture of the Lease, because the Hoyaks did not include this violation in their Notice of Default. ***See id.*** at 11. To the extent that the Hoyaks argue the court erred in limiting "formal notice" under the Lease solely to the written Notice of Default, the trial court responded:

The [c]ourt did not limit the notice required under the Lease as alleged. Rather, the [c]ourt found that the aforementioned Notice of Default constituted the only formal notice given in this case, and that, as a result, [the Hoyaks] waived any defaults not listed therein. Though perhaps not sufficiently explaining the reasons for this finding in its Decision, the [c]ourt essentially

"held" [the Hoyaks] to this written notice based on principles of estoppel, an affirmative defense properly pleaded by [Mr. Dippolito] in his New Matter and argued by him at trial.

> It is fundamental that equitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. In short, equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely upon that conduct to his or her detriment.

> *Commonwealth ex. rel. Gonzalez v. Andreas*, 369 A.2d 416, 418 (Pa. Super. 1976). In light of these principles, the [c]ourt found that once [the Hoyaks] sent [Mr. Dippolito] the Notice of Default on November 11, 2013, they were thereafter estopped from arguing that their prior verbal communications constituted proper notice of default under the Lease.

Trial Court Opinion ("TCO I"), 4/7/16, at 22-23. We conclude that the trial court properly applied the law to this matter and that its decision is adequately supported by the record.

With regard to the second alleged violation of the Lease, the trial court stated that the Hoyaks,

> did establish that they asked Mr. Dippolito to plow the Lot following certain snowfalls, that [he] refused, and that his failure to comply rendered the Lot, in [the Hoyaks'] opinion, unsafe. Nevertheless, the evidence did not establish that the Lot remained in this condition unremedied by [Mr. Dippolito] for a period of more than fifteen days.[4] Therefore, even if this issue had been included in the Notice of Default, [the Hoyaks] would

---

[4] In fact, the Hoyaks acknowledge that "in all likelihood, on the occasions on which [Mr.] Dippolito refused to clear the … Lot, any snow or ice would have dissipated from the … Lot within fifteen (15) days, whether naturally or by the actions of a third party in the neighborhood." Hoyaks' Brief at 34, n. 3.

- 13 -

not have proven that the condition of the Lot caused an uncured default warranting forfeiture of the Lease.

Decision at 13. Based on the foregoing, we deem the Hoyaks' continued allegations regarding Mr. Dippolito's failure to timely comply with their requests to plow the Lot to be fruitless.

In response to the third alleged violation of the Lease regarding Mr. Dippolito's failure to obtain proper insurance and/or provide proof thereof, the trial court stated:

> In the Notice of Default, [the Hoyaks] put [Mr. Dippolito] on proper notice that he was in default of paragraph 10.03 of the Lease for failing to provide them with a certificate of insurance confirming that the Lot was covered by liability and property insurance that included them as additional insureds. While [the Hoyaks] did establish that they also previously made a verbal request for a certificate of insurance from [Mr. Dippolito] and that [he] did not comply, the Notice of Default represented the beginning of the fifteen-day window in which [Mr. Dippolito] could cure the insurance-related default….

Decision at 13-14.

As indicated in the trial court's Findings of Facts, after receiving the Notice of Default, Mr. Dippolito made numerous attempts to obtain the proper insurance and to provide the Hoyaks with proof thereof. When his initial attempts were proven to be unsuccessful,

> [Mr. Dippolito] continued to contact his insurance agent in an effort to provide [the Hoyaks] with satisfactory proof of insurance. The last step in that process came on February 14, 2014, when [Mr. Dippolito's] insurance agent sent him a letter confirming that [the Hoyaks] had been added to the Liberty Mutual policy as additional insureds and that the Lot's address had been corrected to 118 E. Greenwich Street, Bethlehem, Pennsylvania, its true address, with both amendments being retroactive to December 27, 2013. This information was

- 14 -

subsequently provided to [the Hoyaks]. [The Hoyaks] do not argue that this last proof of insurance is unsatisfactory.

Taking the above-described sequence of events and the surrounding circumstances as a whole, although [the Hoyaks] did not effectively become additional insureds under [Mr. Dippolito's] policy until December 27, 2013, which is more than fifteen days after the initial Notice of Default, [Mr. Dippolito's] efforts to clarify that the Lot was in fact covered under his insurance policy and to add [the Hoyaks] as additional insureds, though perhaps not sufficient to avoid a technical default, convince the [c]ourt that forfeiture is not warranted. [Mr. Dippolito] promptly initiated the process of attempting to cure the default well within the fifteen-day cure period. The fact that the process of securing a series of changes to and clarifications of an insurance policy took longer than fifteen days from its inception appears to be attributable more to "oversight or uncontrollable circumstances" than to any willful conduct by [Mr. Dippolito]. **Barraclough** [**v. Atlantic Refining Company**], 326 A.2d [477, ]479[ Pa. Super. 1974)]. What is important, especially in this equitable proceeding, is that within fifteen days of receiving the Notice of Default, [Mr. Dippolito] set into motion the process of curing the default, with a full cure eventually being reached, albeit thirty days late. It is this course of good-faith conduct by [Mr. Dippolito] that distinguishes this case from **Cambria-Stoltz Enterprises**[ **v. TNT Investments**, 747 A.2d 947 (Pa. Super. 2000)], which [the Hoyaks] argue controls the outcome here. **See Cambria-Stoltz Enterps.**, 747 A.2d at 949-951 (holding forfeiture of commercial lease was appropriate when defendant-lessee *willfully failed to respond* to plaintiff-lessor's request for certificate of insurance and to be named as additional insured within time period allowed by lease). Rather, the [c]ourt finds [the Hoyaks'] attempt to enforce the forfeiture provision of a ninety-nine-year lease because of [Mr. Dippolito's] "failure to fulfill certain technical obligations, causing no serious detriment," violative of the equitable principles at play here. **Barraclough**, 326 A.2d at 480 (refusing, due to *de minimus* nature of breach at issue, to enforce clause in lease granting plaintiff-landlords *unqualified* right to declare lease terminated upon breach by defendant-tenant).

For all of these reasons, although the issue pertaining to insurance produced a technical default, forfeiture of the Lease is not warranted.

Decision at 13-16 (citations to record omitted) (emphasis in original).

The Hoyaks contend that the trial court erred in finding Mr. Dippolito made good faith efforts to provide them with proper proof of insurance and in characterizing his failure to provide proof of insurance as "*de minimus*." The Hoyaks state that to the contrary, "the evidence at [t]rial proved that, for years, [Mr. Dippolito] intentionally failed to comply with his obligations under the Lease related to insurance coverage for the … Lot."  Hoyaks' Brief at 19-20.  However, "on issues of credibility and weight of the evidence, an appellate court defers to the findings of the trial judge, who has had the opportunity to observe the proceedings and demeanor of the witnesses." ***Commonwealth v. Cunningham***, 805 A.2d 566, 572 (Pa. Super. 2002) (citations omitted).  Moreover, to the extent that the Hoyaks' argument is based on prior verbal requests for proof of insurance, their contention is irrelevant, because the written Notice of Default served as the formal notice of default triggering the cure period under the Lease.

In their final claim on appeal, the Hoyaks argue that the trial court erred in denying their motion for a new trial by concluding that Mr. Dippolito's failure to pay his share of the real estate taxes on the Lot did not constitute a breach of contract or default under the Lease.  The Hoyaks allege that this holding was based on the court's erroneous determination that the Hoyaks failed to provide Mr. Dippolito with proper notice that his share of the real estate taxes were due and owing.  Hoyaks' Brief at 20. However, we deem the Hoyaks' claim to be wholly without merit.

In its December 16, 2015 Decision, the trial court provided a thorough analysis of the failure to pay real estate taxes and the implications thereof:

> In the Notice of Default, [the Hoyaks] advised [Mr. Dippolito] that he was in default for failing to pay real estate taxes for the Lot, as required by the Lease, from 2000 to the present. The evidence made clear that the Notice of Default was the first time [the Hoyaks] requested that [Mr. Dippolito] pay any real estate taxes from the time he took possession of the Lot. [The Hoyaks] included with the Notice of Default a Property Tax Worksheet, representing their computation of the total amount of real estate taxes [Mr. Dippolito] was responsible for since 2000, broken down by year. However, the Lease only required [Mr. Dippolito], upon notice from [the Hoyaks], to pay thirty-seven percent of the real estate taxes "*presently charged* against the land." The Court takes judicial notice of the fact that real estate taxes are assessed against land on an annual basis and are discharged once they are remitted. Thus, the notice that [the Hoyaks] were required to give [Mr. Dippolito] under the Lease, in order to trigger his responsibility to pay real estate taxes, necessarily must have been provided him after real estate taxes were assessed against the Property and before they were remitted. This is the only type of notice that complies with the Lease terms and triggers [Mr. Dippolito's] responsibility to pay, given the maxim in the law that improper notice "amount[s] to no notice at all." *March v. Banus*, 151 A.2d 612, 615 (Pa. 1959). As the Notice of Default purported to collect from [Mr. Dippolito] over a decade's worth of real estate taxes that had already been assessed to and discharged from the land, the Notice of Default did not satisfy the notice requirement in paragraph 10.06 and, as a result, did not trigger [Mr. Dippolito's] responsibility to pay those taxes. Proper notice not having been given, [Mr. Dippolito's] failure to pay real estate taxes was not a default under the Lease, much less one that warrants its forfeiture.

Decision at 16-18 (footnote omitted).

The Hoyaks argue in the alternative that, even if the Lease requires them to make an annual demand to Mr. Dippolito for payment of his share of the real estate taxes, then the court erred in failing to find that Mr. Dippolito

was responsible for payment of at least the real estate taxes for the year 2013 in the amount of $538.60. This argument was thoroughly addressed by the trial court in its April 7, 2016 Opinion:

> [The Hoyaks'] final argument is that [Mr. Dippolito] was provided with proper notice of the real estate taxes that he owed for 2013, the year in which the Notice of Default was sent. Essentially, [the Hoyaks'] argument is that [Mr. Dippolito], upon receiving the Notice of Default, which the Court found to be clearly defective with regard to past due real estate taxes, should have singled out and paid the taxes for 2013, ignoring the fact that [the Hoyaks] improperly purported to be demanding over a decade's worth of taxes. To expect [Mr. Dippolito] to have done so is unreasonable, especially in light of the fact that [he] also did not have the benefit of the [c]ourt's interpretation of the Lease at that relevant time. Rather, the [c]ourt repeats its earlier conclusion that the defective notice deployed by [the Hoyaks] did not trigger [Mr. Dippolito's] responsibility to pay real estate taxes pursuant to paragraphs 10.05 and 10.06 of the Lease. As a result, [Mr. Dippolito] did not breach the Lease, much less forfeit it, by failing to pay real estate taxes for 2013, and the [c]ourt will not enter JNOV, grant a new trial, or modify its Decision on the basis that he did commit such a breach.

TCO I at 25-26. After careful review, we discern no error of law or abuse of discretion by the trial court, and find the Hoyaks' argument without merit.

We now turn to the issues raised by Mr. Dippolito herein, all of which concern whether the terms of the Lease provided for an award of attorney's fees and/or question the amount of attorney's fees awarded. "We note that the interpretation of the terms of a contract is a question of law for which our standard of review is *de novo*, and our scope of review is plenary." **McMullen v. Kutz**, 985 A.2d 769, 773 (Pa. 2009). "Our standard of review of an award of attorney['s] fees is well[-]settled: we will not disturb a trial

court's determinations absent an abuse of discretion. A trial court has abused its discretion if it failed to follow proper legal procedures or misapplied the law." **Miller v. Miller**, 983 A.2d 736, 743 (Pa. Super. 2009) (internal citations omitted).

In his first claim, Mr. Dippolito avers that the trial court erred in determining that the language of the Lease as to damages included counsel fees. After careful review, we conclude that the trial court properly interpreted the Lease to provide for the recovery of attorney's fees and, thus, Mr. Dippolito's claim is wholly without merit.

"The general rule in this Commonwealth is that there is no recovery of attorney's fees from an adverse party in the absence of an express statutory authorization, clear agreement between the parties, or the application of a clear exception." **Bayne v. Smith**, 965 A.2d 265, 267 (Pa. Super. 2009).[5] Whether the Hoyaks are entitled to attorney's fees in the present case hinges on the following provision in the Lease:

7.00 <u>Additional Rent</u>.

    [Mr. Dippolito] agrees to pay as additional rent any and all sums which may become due by reason of the failure of [Mr. Dippolito] to comply with any of the covenants of this lease and any and all damages, costs and expenses which [the Hoyaks] may suffer or incur by reason of any default of [Mr. Dippolito] or failure on his part to comply with the covenants of this issue, and also any and all damages to the demised premises caused

---

[5] This general rule is commonly known as the "American Rule." **See Trizechahn Gateway LLC v. Titus**, 976 A.2d 474, 482-483 (Pa. 2009).

by any act or neglect of [Mr. Dippolito], his guests, agents, employees or other occupants of the demised premises.

Lease at 3.

In response to the Hoyaks' post-trial motion for relief and motion for attorney's fees, the trial court conducted an in-depth analysis of whether the language contained in paragraph 7.00 of the Lease constitutes an exception to the American Rule. More specifically, the court examined,

whether the parties clearly agreed that the attorney's fees voluntarily incurred by [the Hoyaks] as a result of their lawsuit for ejectment and breach of contract constitute "damages, costs, and expenses which [the Hoyaks] may suffer or incur by reason of any default of [Mr. Dippolito] or failure on his part to comply with the covenants of" the Lease.

TCO I at 6-7.[6]

For the following reasons, the trial court found that attorney's fees are collectable as "additional rent" pursuant to the language contained in paragraph 7.00 of the Lease:

First, the Lease states that "[a]ny headings preceding the text of the several paragraphs and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this [L]ease, nor shall they affect its meaning, construction, or effect." Consequently, the fact that paragraph 7.00 is titled "Additional Rent" has no bearing on the [c]ourt's interpretation of the Lease. Although paragraph 7.00

---

[6] The trial court stated that it is not aware of any Pennsylvania authority directly on point; however, it cited several decisions outside of this jurisdiction holding that attorney's fees may be collected as "additional rent." *See* TCO I at 8 (citing *LJC Corp. v. Boyle*, 768 F.2d 1489, 1494 (D.C. Cir. 1985); *Helmsley v. Anderson Clayton & Co.*, 400 N.Y.S.2d 544, 545 (N.Y. App. Div. 1978); *Barrow Realty Corp. v. Vill. Brewery Rest.*, 70 N.Y.S.2d 545, 546-47 (N.Y. App. Div. 1947)).

itself also uses the term "additional rent" in defining the sums to which [the Hoyaks] are entitled, the use of the term appears to flow directly from the heading of paragraph 7.00 and, thus, should similarly be ascribed little interpretational weight.

Another problem with [Mr. Dippolito's] argument that the term additional rent is typically used in connection with charges imposed upon a tenant incidental to the use and occupancy of the leased premises, such as insurance premiums, water and sewer rents, real estate taxes, and costs of repairs, is that most of these "charges" are already imposed on [Mr. Dippolito] in other provisions of the Lease. As a result, it appears that the imposition of "additional rent" in paragraph 7.00 was intended to go beyond the types of charges that [Mr. Dippolito] argues are typically associated with the term…. For all of these reasons, the [c]ourt finds that if [the Hoyaks] are indeed entitled to attorney's fees, it is necessarily by way of additional rent.

TCO I at 8-9 (citations to record omitted).

The trial court then went on to determine whether paragraph 7.00 constitutes an exception to the American Rule. In its analysis, the court relied predominantly on the decision in *Wrenfield Homeowners Ass'n, Inc. v. DeYoung*, 600 A.2d 960 (Pa. Super. 1991), which directly addressed the question of whether certain language that did not clearly refer to attorney's fees nonetheless authorized an award of such fees.

To begin with, the [c]ourt notes that the operative term in *Wrenfield*, "costs of collection," is more readily connotative of attorney's fees than is the phrase used in the parties' Lease, "any and all damages, costs, and expenses which [the Hoyaks] may suffer or incur." However, aside from this, every other aspect of the court's analysis in *Wrenfield* lends support to [the Hoyaks'] position.

First, in *Wrenfield*, the Superior Court affirmed the trial court's award of attorney's fees "because it found that such fees were *included* in the phrase 'costs of collection.'" *Wrenfield*, 600 A.2d at 627 (emphasis added). This indicates that the proper inquiry is whether the language at issue *includes*

- 21 -

attorney's fees, not necessarily whether the language at issue is merely another word for attorney's fees. Here, the [c]ourt believes it to be plain that the pertinent language in paragraph 7.00, namely "any and all … costs and expenses which [the Hoyaks] may suffer or incur," includes attorney's fees. Focusing on whether attorney's fees are included in that language, broad terms such as "any and all," "costs and expenses," and "may suffer or incur" are highly inclusive in nature, strongly supporting [the Hoyaks'] argument.

Moreover, the [c]ourt notes the following discussion in *Wrenfield*, which dispositively answers the question of whether [the Hoyaks] are entitled to attorney['s] fees in this instant case:

> The fact that the Declaration did not explicitly state that attorney['s] fees are part of the costs of collection does not prevent the court from finding that there was a valid, enforceable agreement to assess them. In a case in which the controlling document did not expressly provide for attorney['s] fees, the Pennsylvania Supreme Court found that the language nevertheless permitted the imposition of such fees. The court found that a provision in a trust agreement requiring that a party "reimburse the Trustee for all its expenditures, and to indemnify and save the Trustee harmless against *any liabilities which it may incur* in the exercise and performance of its powers and duties hereunder," was broad enough to include the payment of attorney['s] fees. **Fidelity-Philadelphia Trust Co. v. Philadelphia Transp. Co.**, 404 Pa. 541, 548, 173 A.2d 109, 113 (1961). The Court specifically held that "the broad scope of reimbursement provided by the general provision of the Indenture is sufficiently specific to include attorney['s] fees." **Id.** at 548[-]549, 173 A.2d at 113-14. Similarly, we find that the term "costs of collection" within the context of the Declaration was also sufficiently broad enough to encompass attorney['s] fees.

**Wrenfield**, 600 A.2d at 629-30 (emphasis added). Reading the **Wrenfield** analysis as a whole, it becomes clear that the issue presently before the [c]ourt is whether the phrase "any and all … costs and expenses which [the Hoyaks] may suffer or incur by reason of any … failure on [Mr. Dippolito's] part to comply with the covenants of this [L]ease" *includes* and/or is *sufficiently broad enough to encompass* attorney's fees within the context of the Lease. Framing the question that way, the [c]ourt finds it

- 22 -

implausible to argue that the pertinent language in paragraph 7.00, which [the Hoyaks] accurately describe as "significantly broad," does not include or is not sufficiently broad enough to encompass the attorney's fees incurred by [the Hoyaks] in litigating this action.

…

Further, it is clear that this action was only initiated "by reason" of [Mr. Dippolito's] breaches of the parties' lease. Although [the Hoyaks] were of the opinion that those breaches warranted forfeiture of the Lease and the [c]ourt was not, the principle remains the same. For all of the above reasons, the [c]ourt finds that paragraph 7.00 of the Lease entitles [the Hoyaks] to an award of attorney's fees as additional rent.

TCO I at 11-14.

Next, Mr. Dippolito alleges that the trial court erred in failing to consider and compare the amount of damages claimed in the Hoyaks' complaint and the amount actually awarded. This claim is waived due to Mr. Dippolito's failure to raise it in his motion for post-trial relief or in his memorandum of law in opposition to the Hoyaks' motion for counsel fees. *See* Pa.R.A.P. 302(a) (providing that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); *see also Sovereign Bank v. Valentino*, 914 A.2d 415, 426 (Pa. Super. 2006) (stating that issues not raised in a post-trial motion are waived for appeal purposes).

Even if this claim had been properly preserved, we would deem the issue to be meritless, as our review of the record reveals the trial court properly considered the amount of damages awarded to the Hoyaks in determining the amount of attorney's fees awarded them. The trial court

expressly addressed this issue in its April 7, 2016 Opinion granting the Hoyaks' request for attorney's fees:

> The final relevant factor to be considered by the [c]ourt is the result obtained by [the Hoyaks]…. [The Hoyaks] suffered no damages as a result of [Mr. Dippolito's] actions or inactions and were awarded nominal damages. Out of the two claims brought, ejectment and breach of contract, [the Hoyaks] were only successful on one, the breach of contract claim. With regard to that claim, [the Hoyaks] were only successful on four of the five alleged breaches, resulting in this [c]ourt finding only that [Mr. Dippolito] had committed four *technical* breaches of the Lease, a result that was more or less symbolic. In sum, [the Hoyaks] were only successful on eighty percent of one-half of their claims, or forty percent of their claims.

TCO I at 19-20 (emphasis in original). Based largely on the nominal monetary damages awarded to the Hoyaks, the trial court found that it would be unreasonable to require Mr. Dippolito to pay all of their counsel fees and, thus, it reduced the attorney's fees award by approximately sixty percent. **See id.** at 20; **See also** Trial Court Opinion ("TCO II"), 6/2/16, at 3.

Next, Mr. Dippolito avers that the trial court erred in assuming that it was required to award attorney's fees to the Hoyaks, because they received a *de minimis* award. However, this argument is based on a faulty assumption. As the trial court stated in its Pa.R.A.P. 1925(a) opinion, "the [c]ourt notes that it did not assume that it was required to award attorney['s] fees to [the Hoyaks]; rather, the [c]ourt found that the parties' lease agreement and [Mr. Dippolito's] breaches thereof entitled [the Hoyaks]

to such an award." TCO II at 4. Thus, Mr. Dippolito's argument is of no moment.

Mr. Dippolito further argues that the trial court erred in failing to find that the Hoyaks' claim was to uphold a significant public purpose before it awarded attorney's fees in connection with a nominal award. In support of his argument, Mr. Dippolito cites solely to **Farrar v. Hobby**, 506 U.S. 103 (Pa. 1992), for the proposition that no attorney's fees, or at best a very nominal award of attorney's fees, are appropriate, "*unless the action was to advance a public benefit*." Mr. Dippolito's Brief at 16 (citing **Farrar**, 506 U.S. at 121-122). Mr. Dippolito suggests that the Hoyaks' motives were to advance their own interests, not the public's interest, and concludes that the award for fees "cannot withstand scrutiny and should be stricken." **Id.**

As the trial court pointed out in its Rule 1925(a) opinion, Mr. Dippolito is relying on a federal civil rights case in which attorney's fees are claimed pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Accordingly, the trial court concluded that "[b]ecause this is not a civil rights case, [Mr. Dippolito's] complaint is not applicable." TCO II at 4. We agree, as federal civil rights actions apply a different legal standard when determining attorney's fees awards. This Court has previously noted this distinction:

> [W]here counsel fees are statutorily authorized in order to promote the purposes of a particular legislative scheme, the trial court should not determine the appropriateness of counsel fees under the general standards applicable in all litigation. Rather, it should consider whether an award of fees would, in the

circumstances of the particular case under consideration, promote the purposes of the specific statute involved.

*Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 788 (Pa. Super. 2006) (quoting *Krassnoski v. Rosey*, 684 A.2d 635, 639 (Pa. Super. 1996)). Based on the foregoing, we find no abuse of discretion on the part of the trial court and deem this claim to be without merit.

The last two issues listed in Mr. Dippolito's Statement of Questions Involved are not even mentioned in the argument section of his brief. Thus, we need not reach the merits of these claims. Pennsylvania Rule of Appellate Procedure 2119 expressly states that the argument section of a brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part–in distinctive type or in type distinctively displayed–the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "Appellate arguments which fail to adhere to [the Rules of Appellate Procedure] may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." *Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa. Super. 2014). Here, Mr. Dippoito's brief is completely void of any discussion whatsoever of these claims, and he fails to cite to any authority in support thereof. "This Court will not act as counsel and will not develop arguments on behalf of an appellant." *Id.* Accordingly, we conclude that these issues are waived.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/13/2017